IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
May 23, 2001 Session

## STATE OF TENNESSEE v. JEREMY WAYNE AIKENS

**Direct Appeal from the Criminal Court for Loudon County**
**No. 9622      E. Eugene Eblen, Judge**

_____

**No. E2000-00997-CCA-R3-CD**
**July 30, 2001**
_____

The Loudon County Grand Jury indicted the Defendant for driving under the influence of an intoxicant. The Defendant's first jury trial resulted in a mistrial. Following a second trial, a Loudon County jury convicted the Defendant of the offense charged. The trial court sentenced him to eleven months, twenty-nine days incarceration, with all but four days suspended, and fined him $400. The Defendant now appeals his conviction, arguing (1) that insufficient evidence was presented to support his conviction; and (2) that he received ineffective assistance of counsel at trial. Upon review of the record, we conclude that the evidence presented at trial was sufficient to support the Defendant's conviction, and we conclude that the Defendant received adequate representation at trial. We thus affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and THOMAS T. WOODALL, J., joined.

Wesley M. Baker, Knoxville, Tennessee (on appeal); and Alfred Hathcock, Harriman, Tennessee (at trial); for the appellant, Jeremy Wayne Aikens.

Paul G. Summers, Attorney General and Reporter; Angele M. Gregory, Assistant Attorney General; J. Scott McCluen, District Attorney General; D. Roger Delp, Assistant District Attorney General; for the appellee, State of Tennessee.

### OPINION

In April 1998, the Loudon County Grand Jury indicted the Defendant, Jeremy Wayne Aikens, for one count of driving under the influence of an intoxicant. The case subsequently proceeded to trial, but resulted in a mistrial. On January 13, 1999, a second trial was conducted, and at its conclusion, a Loudon County jury found the Defendant guilty of the offense charged. On October 12, 1999, the trial court sentenced the Defendant to eleven months, twenty-nine days' incarceration, all suspended except four days. The trial court also fined the Defendant $400. The Defendant now

appeals his conviction, arguing (1) that the evidence presented at trial was insufficient to support his conviction, and (2) that he received ineffective assistance of counsel at trial. We affirm the judgment of the trial court.

At trial, Officer David A. Flynn testified that he had served as a patrol police officer for the Knoxville Police Department from 1990 until 1997 and for the Lenoir City Police Department since July 28, 1997. He stated that it was part of his regular duties to make arrests for alcohol-related offenses. Officer Flynn recalled that on December 6, 1997, while he was working the "midnight shift" in Lenoir City, he received a radio dispatch at approximately 3:45 a.m. for a "burglary in progress" at an apartment complex. The dispatcher informed him that the suspects were two individuals in a black truck who were leaving the scene.

Flynn testified that from the time of the initial dispatch, it took him a minute or less to reach the apartment complex. He recalled that as he was pulling into the apartment complex, he saw a black truck containing two individuals leaving the complex. He activated his lights and pulled in front of the truck to stop it. The truck stopped approximately 100 yards from the apartments. Flynn then radioed the dispatcher and reported that he had stopped a vehicle matching the description previously provided. Other officers soon arrived at the scene.

Flynn testified that he approached the driver's side of the truck and that another officer approached the passenger's side of the truck. Flynn reported that he asked the driver to step out of the vehicle. He stated that he recognized the driver as the Defendant, whom he had seen on other occasions. Flynn recalled that as the Defendant exited the truck, he "was a little unsteady on his feet, kind of swaying." He also noted that the Defendant "had an odor of alcoholic beverage about him, . . . kind of slurred speech, glassy eyes." Flynn stated that the odor of alcohol was coming from the Defendant's breath, and he recalled that the Defendant was wearing a blue shirt and blue jeans that "were wet on his left side." He also reported that the Defendant behaved differently than he had behaved on other occasions when Flynn had seen him.

Flynn testified that he asked the Defendant if he had just come from apartment 8-A at McGhee Square Apartments, the apartment where the burglary had reportedly just occurred. According to Flynn, the Defendant reported that he had been visiting relatives at an apartment in building eleven at McGhee Square. Flynn then sent one of the other officers at the scene to apartment 8-A to collect information.

Following this discussion, Officer Flynn asked the Defendant to perform field sobriety tests. He first asked the Defendant to perform the walk-and-turn. Flynn explained that this test requires the suspect to take nine steps in a straight line, touching heel to toe each step. Following the ninth step, the suspect must pivot to face the opposite direction and again take nine steps heel-to-toe, returning to the starting point. Flynn stated that he also had the Defendant perform a one-leg stand. He explained that this test requires the suspect to stand on one foot, with hands down by his or her sides; raise one foot off of the ground; and remain in that position for thirty seconds.

Flynn recalled that the Defendant was "kind of talkative and loud" during the field sobriety tests. He testified that he had to explain the walk-and-turn test to the Defendant twice before the Defendant understood the instructions, and Flynn stated that the Defendant could not keep his balance while listening to the instructions. Flynn testified that the Defendant first tried to perform the test wearing his boots, but quickly stopped to remove his boots before resuming the test in his socks. Flynn stated that the Defendant was "kind of wobbly" while wearing his boots. He reported that when the Defendant attempted the test after removing his boots, he missed two steps while returning to the starting point. Flynn testified that the Defendant successfully completed "about half" of the test and stated, "[H]e didn't really pass." Flynn further testified that when attempting the one-leg stand, the Defendant raised his arms to catch his balance and put his foot down at fifteen seconds. He then quit the test at twenty-five seconds and told Officer Flynn that he could not perform the test.

Following the tests, Flynn placed the Defendant under arrest. He reported that he also placed the passenger in the truck, whom he described as "extremely intoxicated," under arrest for public intoxication. Flynn testified that after arresting the two men, he found a twelve-pack of Miller Lite beer bottles in the cab of the truck. He stated that only six full bottles remained in the cardboard container.

After placing the two men under arrest, Flynn went to apartment 8-A at McGhee Square Apartments. He found a Miller Lite beer bottle lying next to the door of the apartment. Flynn recalled that the door of the apartment, which was metal, had scuff marks and a footprint on it. He stated, "[I]t was bowed in about . . . an inch." Flynn testified that the footprint appeared to have been made by a tennis shoe and that the scuff marks appeared to have been made by a boot; Flynn recalled that on the night of the arrests, the Defendant wore boots, and the passenger in the truck wore tennis shoes.

Officer Mark Grossbard testified that he had served as a police officer for the Lenoir City Police Department for approximately three years and stated that he was working with Officer Flynn on the night of December 6, 1997. Officer Grossbard reported that he received a police radio call concerning a possible break-in at one of the apartments at McGhee Square. He stated that when he responded to the call, he encountered Officer Flynn's police vehicle at the scene. He recalled that Flynn and the Defendant were talking when he arrived, and he therefore went to the passenger's side of the Defendant's truck to speak to the passenger. Grossbard stated that he recognized the passenger as "Russell" or his nickname, "Gator." Grossbard testified that when he approached Russell, he noticed "an obvious odor of an alcoholic beverage on his person," and he stated that he "believe[d]" Russell was unsteady on his feet.

Sergeant John M. Tinnel of the Lenoir City Police Department testified that he had served as a police officer for about twelve years and that he had been a sergeant for eight of those twelve years. He stated that he was serving as the midnight shift supervisor on the night of the Defendant's arrest. Tinnel recalled that between 3:00 and 4:00 a.m., he was dispatched to a "burglary in progress call" at McGhee Square Apartments. When he arrived, he discovered that Officer Flynn had stopped a vehicle matching the description given by the dispatcher for the vehicle containing the burglary

suspects. Tinnel recalled that when he arrived at the scene, Officer Flynn was administering field sobriety tests to the Defendant. Tinnel described the Defendant as "impaired" and stated, "He appeared to be unsteady to me. When he spoke, his speech was somewhat slurred." He also testified, "[H]ad I made that traffic stop, I would have also had him perform field sobriety tests."

Brian Russell was called as a witness for the defense. He testified that his nickname was "Gator," and he stated that he was the passenger in the Defendant's truck on the night of the arrests. Russell testified that prior to being arrested on December 6, 1997, he and the Defendant went dancing at a club in Knoxville called Judy's, where they arrived at approximately 11:00 p.m. He maintained that the Defendant had agreed to be their designated driver for the evening. After leaving Judy's, he and the Defendant then went to the Mouse's Ear, a "strip club" also located in Knoxville. Russell testified that he and the Defendant stayed at the Mouse's Ear until it closed.

Russell testified that after he and the Defendant left the Mouse's Ear, they went to McGhee Square Apartments in Lenoir City to visit Russell's girlfriend. Russell admitted that he did not know his girlfriend's last name and that he had only known her for approximately two weeks prior to the incident. Russell testified that when he and the Defendant arrived at his girlfriend's apartment, they knocked on the door, but no one answered. However, he claimed that they heard a "TV . . . blaring real loud," so they knocked harder. Russell admitted that he may have kicked the door, but maintained that he did not kick it hard enough to damage it.

Russell recalled that during the course of the evening, he drank approximately eight beers. He stated that he drank two beers at Judy's and later purchased a twelve-pack of Miller Lite. He reported that the Defendant also drank two beers at Judy's, but did not consume any other alcohol that evening.

On cross-examination, Russell admitted that he was not exactly sure how many beers he drank on December 6, 1997. Although he had stated on direct examination that he was not intoxicated, he admitted he had been found guilty of public drunkenness. He also acknowledged that he "wasn't in perfect condition." Finally, Russell admitted that he may have kicked the apartment door harder than he originally thought.

## I. SUFFICIENCY OF THE EVIDENCE

The Defendant first challenges the sufficiency of the evidence used to convict him. The Defendant was convicted of driving under the influence of an intoxicant, defined in Tennessee Code Annotated § 55-10-401. This statute provides, in pertinent part, as follows:

It is unlawful for any person to drive or to be in physical control of any automobile or other motor driven vehicle on any of the public roads or highways of the state, or on any streets or alleys, or while on the premises of any shopping center, trailer park or any apartment house complex, or any other premises which is generally frequented by the public at large, while . . . [u]nder the influence of any intoxicant, marijuana,

narcotic drug, or drug producing stimulating effects on the central nervous system .
. . .

Tenn. Code Ann. § 55-10-401(a)(1).

When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985); Tenn. R. App. P. 13(e). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Dykes, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990), overruled on other grounds, State v. Hooper, 29 S.W.3d 1 (Tenn. 2000).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.

We are satisfied that ample evidence was presented in this case from which a jury could have adduced the Defendant's guilt. The arresting officer testified that when he stopped the Defendant, the Defendant's speech was slurred, his eyes were glassy, he was unsteady on his feet, and he smelled of alcohol. He also stated that he was acquainted with the Defendant and reported that the Defendant behaved differently on the night of the arrest than he normally behaved. The officer further testified that he found a twelve-pack of beer, with only six beers remaining, in the cab of the Defendant's truck. Finally, the officer testified that the Defendant failed two field sobriety tests. Another officer called to the scene verified that the Defendant appeared to be impaired on the night of the arrest. The jury weighed this evidence against testimony by defense witness Brian Russell, who claimed that the Defendant drank only two beers prior to his arrest, and apparently accredited the testimony of the police officers present at the scene of the arrest. We will not disturb this finding on appeal. See Liakas, 286 S.W.2d at 859.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

The Defendant next contends that he received ineffective assistance of counsel at trial. The record reveals that Assistant Public Defender Rowland Cowden represented the Defendant at his first

trial. At the second trial, Assistant Public Defender Alfred Lee Hathcock, Jr., represented the Defendant. The Defendant now complains that he did not realize that Hathcock would be representing him at his second trial until the morning of trial. He also complains that Hathcock failed to interview Brian Russell and him prior to his second trial and that Hathcock failed to prepare them to testify at trial.

Alfred Lee Hathcock, Jr., was called to testify at the hearing on the motion for new trial. Hathcock testified that he had been an assistant public defender for over ten years and had practiced law for approximately twenty-five years. He stated that he had known the Defendant for several years. Hathcock recalled that he first discussed this case with the Defendant when the Defendant visited the Public Defender's Office just prior to his first trial, which ended in a mistrial. He stated that he thought he had also seen the Defendant on other occasions prior to the first trial when the Defendant had visited the office.

Hathcock testified that during the week prior to the Defendant's second trial, Assistant Public Defender Cowden asked him to handle the Defendant's second trial, stating that he no longer wished to represent the Defendant. Hathcock agreed. Hathcock could not recall whether he contacted the Defendant after agreeing to accept the case, but he maintained that he was "well grounded" in the facts of the Defendant's case. He stated that he had heard the Defendant's discussions with Cowden prior to the first trial. He also stated that he reviewed the Defendant's file and read the transcript of the mistrial. Finally, he reported that he was familiar with the road and area where the Defendant was stopped and subsequently arrested.

Hathcock testified that he spoke with the Defendant on the morning of trial, but admitted that he did not discuss the second trial with the Defendant prior to that morning. However, Hathcock emphasized that he had participated in preparing the Defendant for his first trial. Hathcock could not recall whether he had spoken with defense witness Brian Russell prior to the day of trial, but he stated that he thought Russell had visited the Public Defender's Office prior to trial. He recalled that he did speak with Russell on the morning of trial, prior to calling him as a witness, and he admitted that his preparation with Russell was not lengthy. Hathcock reported that he was aware of Russell's conviction for public intoxication and its possible effect on the jury. However, Hathcock maintained that he called Russell as a witness at the Defendant's instruction. He stated, "I would have preferred to have called [the Defendant]. And then not have called Mr. Russell unless he was needed to corroborate [the Defendant's] testimony. But I proceeded in this matter according to instruction."

Hathcock stated that the Defendant's case was not "particularly complex," and he maintained that he felt that he was as prepared as he could have been for the trial. He testified, "[W]hen you have as many cases as we have, there's always something that you could probably think of. But under these circumstances, I think I understood the issues and the facts, and I think there wasn't anything else I could put in place."

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and Article I, Section 9 of the Tennessee Constitution.

State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). This right to representation includes the right to "reasonably effective" assistance. Burns, 6 S.W.3d at 461.

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. Baxter, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a defendant must show that "counsel's representation fell below an objective standard of reasonableness," Strickland v. Washington, 466 U.S. 668, 688 (1984), and that this performance prejudiced the defense, resulting in a failure to produce a reliable result, id. at 687; Cooper v. State, 849 S.W.2d 744, 747 (Tenn. 1993). To satisfy the requirement of prejudice, a defendant must show a reasonable probability that, but for counsel's unreasonable error, the fact finder would have had reasonable doubt regarding the petitioner's guilt. Strickland, 466 U.S. at 695. This reasonable probability must be "sufficient to undermine confidence in the outcome." Id. at 694; see also Harris v. State, 875 S.W.2d 662, 665 (Tenn. 1994).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. Strickland, 466 U.S. at 690; State v. Mitchell, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. Strickland, 466 U.S. at 690; Cooper, 849 S.W.2d at 746; Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462. Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. Williams v. State, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980).

A defendant claiming ineffective assistance of counsel must prove the allegations of fact underlying the claim by clear and convincing evidence. Tenn. Code Ann. § 40-30-210(f); State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). This standard applies regardless of whether the defendant brings the claim on direct appeal or in a post-conviction petition. Burns, 6 S.W.3d at 461 n.5. A claim of deficient representation presents a mixed question of law and fact and thus is subject to a de novo review. Id. at 461. However, the trial court's findings of fact are accorded a presumption of correctness, while its conclusions of law are subject to a purely de novo review by this Court. Fields v. State, 40 S.W.3d 450, 456-457 (Tenn. 2001).

Having reviewed the record, we conclude that counsel's performance in this case was well within the range of competence demanded of attorneys in criminal cases. Although Hathcock accepted the case shortly prior to trial, his uncontradicted testimony was that he was sufficiently prepared for trial. He testified that he was familiar with both the Defendant and this case prior to accepting the case. He reported that he participated to some extent in the preparations for the Defendant's first trial, that he reviewed the Defendant's file, and that he reviewed the transcript of the Defendant's first trial. He further testified that he met with both the Defendant and Brian Russell

on the morning of trial. Finally, he stated that he was aware of Russell's public intoxication conviction and maintained that the decision to call Russell as a witness was the Defendant's decision. We find no error on the part of the Defendant's attorney. However, even assuming that Hathcock's representation of the Defendant was in some way deficient, we are satisfied that any error on Hathcock's part was harmless. The Defendant points to no prejudice resulting from his attorney's performance. On the basis of this record, we are simply unconvinced that had Hathcock performed differently, the jury would have had reasonable doubt concerning the Defendant's guilt. We therefore find this issue to be without merit.

Accordingly, we AFFIRM the judgment of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE